Filed 3/9/23  In re F.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re F.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. V.C., Defendant and Appellant. | E079350 (Super.Ct.No. J292205) OPINION |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Reversed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

V.C. (mother) is the mother of F.C. (F. or child). She suffers from PTSD as a result of her military service, which included combat. As of early 2022, when F. was 11, the mother was living with her ex-husband; she was under the care of a mental health specialist, who had prescribed psychoactive medication for her. However, she stopped taking her medication. Apparently as a result, she had a psychotic break. She imagined her ex-husband was molesting F.; she left the home and sought help, first from neighbors and then from her church. Her church paid for a hotel room for her and F., but she "destroyed" it.

As a result, Children and Family Services (CFS) detained F. The juvenile court found true a jurisdictional allegation that the mother's mental illness posed a substantial risk of serious physical harm to F. It removed F. from the mother's custody.

The mother appeals. She contends that there was insufficient evidence to support this jurisdictional allegation, and that there was insufficient evidence to support the removal. We agree that there was insufficient evidence to support the jurisdictional allegation; the removal is therefore moot.

I

FACTUAL AND PROCEDURAL BACKGROUND

The mother is an Army veteran who saw combat during Operation Desert Shield. She has no criminal record.

2

F. was 11 when this dependency was filed and at the jurisdictional/dispositional hearing; he is now 12.

F. is the mother's child by F.D. (father); the parents lived together for eight months in 2010. When the dependency was filed, the father was believed to live in Texas. The mother received $600 a month out of his disability benefits as child support.

In 2011, F. had been removed from the mother's custody due to alcohol abuse and depression.[1] She had reunified with him successfully.

In 2019, the mother had been reported to CFS because, after failing to pick F. up from school, she was found to be drunk and unconscious. She engaged in voluntary family maintenance services from May 2019 through June 2020.

As of 2022, the mother was living with her ex-husband T.C. (T.). They had been divorced since 2002 (or 2006), but around 2020, he let her live with him because she was homeless.

On February 7, 2022, the mother "saw something in the closet that scared her." She woke F. and told him they had to leave. They ran to a neighbor's house and hid in the back yard.

When the neighbor found them, the mother "was acting strange"; she was barefoot, and she poured a couple of bottles of water on herself. She claimed she had

---

[1] The responsible social services agency placed two-year-old F. with the mother's brother. He left F. alone in a bathtub with the hot water running; F. suffered second and third degree burns and was left with "scars from his legs to his stomach."

found T. having sex with F. She said she "wanted to contact her pastor to see if he could help them get somewhere safe and then she wanted to contact law enforcement once they were safe."

She and F. then went to the home of a member of her church. She said they were homeless and had not eaten for several days. She had previously told a church member that T. did not let her or F. eat or drink.

Her pastor took her and F. to a hotel and got her a room there. According to the hotel, the mother "destroyed the room." The hotel called the police. The mother was placed on a Welfare and Institutions Code section 5150 hold.[2] F. was left with church members; one of them, Ms. B., took him into her care.

During her hospital stay, the mother was cooperative and not aggressive. Her diagnosis was "psychosis likely due to [b]ipolar [d]isorder." She continued to claim that T. had molested F.; she said that, once she had enough evidence, she would call the police. She also claimed that T. was poisoning her and F.

When interviewed, F. said "the incident with his mother scared him." However, he missed his mother.

He reported that the mother did not like being called "crazy," because "she had been called 'crazy' too much." However, she "often" acted — in his preferred wording — "out of character." She would talk about demons, say the devil was in the home, and

---

**2** All further statutory citations are to the Welfare and Institutions Code.

4

pray loudly. She would go to neighbors' houses, ask for water, claim it was holy water, and pour it on herself. He added that she had PTSD, "but she has gotten help for that." She used to drink but had stopped. The mother was home-schooling F. through a Victor Valley Desert Christian School "non-campus" program. F. denied any sexual abuse.

F. said T. drank heavily and did not let him or the mother eat or drink; they had to wait until he passed out to "sneak into the kitchen and take food." He also said the mother and T. had verbal arguments in which T. used profanity. After the last such argument, the mother left the home.

T., too, denied any sexual abuse. He denied preventing the mother or F. from eating; he slept near the kitchen and told her not to use it when he was sleeping. According to T., the mother was not drinking, but she used marijuana "occasionally." He said "he was not aware of [her] mental health needs until recently."

On February 13, the mother was released from the 5150 hold. She did not try to contact F. According to the mother, during this time, she did not have stable housing. The first night, she stayed with T., but the next day, he "kicked her out." Hotels would not accept her credit card. On February 14, a hospital let her stay overnight, due to "inclement weather." According to her pastor, on February 15, he arranged for her to enter a shelter. According to T., however, on February 15, the mother came home, "ransacked" her room, then got money for a hotel from a neighbor.

On February 16, CFS detained F. and filed a dependency petition regarding him. He was placed briefly with Ms. B., but by March 10, he was placed with his godmother.

On February 22, the mother testified positive for marijuana. On March 1, she tested negative for all substances. She offered to test on demand.

Also on March 1, a social worker interviewed the mother. She said she currently had PTSD due to her military service and had previously had depression. She denied having bipolar disorder. She was under the care of a "mental health specialist," one Dr. Han, who had prescribed Effexor (Venlafaxine) for her. Recently, she had stopped taking it, because it gave her "night terrors." However, stopping gave her "severe withdrawal[]" symptoms.

She explained that she had run away from T. because he was "abusive and cruel." He was a "chronic" drinker, and he limited when and how much she and F. could eat. She contacted her church, which got her a hotel room. The next day, church officials took her to the hospital, because they believed she was "demon-possessed." They assured her that they would take care of F. She offered them $600 to pay for his care, but they would not take it.

She denied destroying the hotel room. Rather, she said, she had rearranged the furniture and cleaned the room. In doing so, she accidentally damaged an "electrical component." She was willing to pay for the resulting damages.

The mother said she had not used alcohol "in over two years." She had been using marijuana "to treat . . . eating-related issues" but was not any longer.

She was employed as a nurse.[3] She had obtained temporary housing through Veterans' Affairs and was on a waiting list for permanent housing.

In a further interview, F. said he felt safe with the mother. He said T. did not let him or the mother in the kitchen during certain times of day, but he never went without food. The mother "used to have a problem" with alcohol. Currently, however, she drank "very, very little," only beer, and that only on "rare occasions." She had been normal for "days or weeks" before February 7. F. was "proud" of the mother because she had given birth through Caesarean section and "had been through a war." He described her as "very strong."

Ms. B. reported that the mother sometimes "made remarks that were 'a little off' but were not enough to cause concern." Text messages between the mother and Ms. B. showed no signs of "mental health issues."

A social worker concluded, "[I]t is unknown whether [the mother's mental health issues] ha[ve] impacted her ability to provide care and supervision for the child." "[She] appears to have acted in the interests of her child when she was offered help from the church she attended and left her child in their care believing he was safe with them in her absence."

---

[3]    Despite being employed, the mother was chronically short of money. She needed housing assistance, her credit card was repeatedly declined, and she admitted "pawning her jewelry for cash." CFS does not seem to have investigated either her employment or her financial status.

In March 2022, the mother entered a residential program for veterans, which included therapy, in San Diego. She was in compliance with all program requirements; she had had no negative incident reports and no disciplinary problems. "[S]he ha[d] not had a positive [test] including for alcohol. She state[d] she has had 2 & ½ years of sobriety." She had volunteered for the resident peer council and had helped to mentor other residents. Once she graduated, the program would "help [her] secure permanent housing."

In April 2022, she started in a treatment program for combat-related PTSD. She was also "attending outside support groups in the evening." She was taking Effexor again.

At the jurisdictional/dispositional hearing, the juvenile court found that it had jurisdiction based on both parents' failure to protect (§ 300, subd. (b)) and the father's failure to support (§ 300, subd. (g)). It ordered reunification services for the mother but not for the father.

II

JURISDICTION

The mother contends that there was insufficient evidence to support the jurisdictional allegation as to her.

A.      *Additional Factual and Procedural Background.*

The petition alleged, among other things, that:

8

"b-3  The child's mother . . . has ongoing mental health issues, which limits her ability to provide adequate care and supervision of the child . . . , which places him at risk of danger and/or harm."

"b-4  The child's alleged father['s] . . . current whereabouts are unknown.  He has failed to ensure the safety and well-being of his child and[/]or to provide care/support for the child . . . ."

"g-7  The current whereabouts of the child's alleged father[] . . . are unknown.  The alleged father's ability/willingness to provide adequate care and supervision for the child is currently unknown."

In the report for the jurisdictional/dispositional hearing, CFS recommended that the juvenile court find all of the allegations as to the mother — including the b-3 mental health allegation — *not* true, and that it find true only the b-4 allegation of failure to protect and the g-7 allegation of failure to support as to the father.

Counsel for the minor, however, asked the juvenile court to find the b-3 mental health allegation true:  "She hasn't shown any true period of stability at this point . . . ."

Counsel for the mother argued, "[H]er ongoing mental health diagnosis does not place F[.] under any risk."  She represented that, when the mother stopped taking Effexor, she did so "based on her psychologist's recommendation."  Currently, "she is in treatment, she has the medication . . . ."

The juvenile court found true the b-3 mental health allegation as to the mother.  It explained:

9

"It looks like Mom's addressing her mental health now and she has at times in the past but it's also clear that that's not been consistent and when she's not appropriately medicated that her behavior does place the child at risk.

"I'll note that . . . she stopped taking her medication which caused the unusual behavior that led to this case, which included destruction of a hotel room with the child in the hotel.  I'll also note that it's clearly not the first time the mother has experienced unusual behavior; . . . the minor . . . describe[s] Mom's episodes of her being out of character because she does not like being called crazy and [has] been called crazy too much and it's clear that the child is describing other occasions where there's been concerns.

"I'll also note that the child indicated that the mother had been out of character for an unspecified amount of time and that the mother did test positive for marijuana which is inconsistent with appropriate treatment for her diagnosis . . . ."

It also found true the b-4 and g-7 allegations regarding the father.

B.      *Justiciability*.

Preliminarily, CFS argues that this contention is not justiciable, because the juvenile court also found that it had jurisdiction based on the father's failure to protect and failure to support.

"Dependency jurisdiction attaches to a child, not to his or her parent.  [Citation.]" (*In re D.M.* (2015) 242 Cal.App.4th 634, 638.)  "Only one jurisdictional finding is required for the dependency court to assert jurisdiction over a child.  [Citations.]"  (*In re*

10

*Mia Z.* (2016) 246 Cal.App.4th 883, 894.) "'As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate.' [Citation.]" (*In re D.P.* (2015) 237 Cal.App.4th 911, 916.)

"On the other hand, an exception to this general rule has been recognized: '[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) "could have other consequences for [the appellant], beyond jurisdiction" [citation].' [Citation.]" (*In re L.O.* (2021) 67 Cal.App.5th 227, 237.)

Here, the jurisdictional finding regarding the mother served as the basis for the dispositional order formally removing F. from her custody and placing him outside the home. Had there been no issues with the mother's parenting, the mere fact that the father was not protecting or supporting the child would not have authorized removal from the mother. (§ 361, subds. (c)(1) [child may be removed if "[t]here is or would be a substantial danger to . . . the minor if the minor were returned home"], (c)(5) [child may be removed if "[t]he minor has been left without any provision for his or her support"].)

We also note that the true findings as to the father are hardly "unassailable" They were implicitly premised on the true finding as to the mother. The fact that the father was not adequately caring for, supervising, or supporting the child could not possibly create "a substantial risk . . . of serious physical harm" (§ 300, subd. (b)) as long as the mother

11

was doing so.  And he did not leave "the child . . . without any provision for support" (§ 300, subd. (g)) as long as the mother was supporting F.  (*In re Anthony G.* (2011) 194 Cal.App.4th 1060, 1065.)  Although the mother has not explicitly challenged the sufficiency of the evidence of these findings, they stand or fall on the sufficiency of the evidence of the true finding as to her.

C.     *Merits.*

Under section 300, subdivision (b), the juvenile court has jurisdiction based on failure to protect when:  "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's . . . mental illness . . . ."

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction.  [Subdivision (b) and other] subdivisions . . . require only a 'substantial risk' that the child will be abused or neglected.  The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.'  [Citation.] 'The court need not wait until a child is seriously abused or injured to assume jurisdiction

and take the steps necessary to protect the child.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Jurisdiction need only be proven by a preponderance of the evidence. (§ 355, subd. (a); *In re J.S.* (2021) 62 Cal.App.5th 678, 685.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]."' [Citation.]" [Citation.]' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

"The existence of a mental illness is not itself a justification for exercising dependency jurisdiction over a child. [Citation.] 'It cannot be presumed that a mother who is proven to be [mentally ill] will necessarily be detrimental to the mental or physical well-being of her offspring. There are innumerable eccentric parents whose behavior on certain occasions may be less th[a]n socially acceptable and yet they are

loving and compassionate parents. Conversely, there are parents who always exhibit socially acceptable behavior publicly, but whose children have parent-induced psychological and emotional problems their entire lives.' [Citation.]" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 563-564.)

The juvenile court reasonably concluded that the mother had mental health issues before the psychotic break that precipitated the dependency. F. said she "often" acted "out of character" — his euphemism for "crazy." Moreover, while he said she had been normal for "days or weeks" before the latest incident, that necessarily implied that, within months or years before, she had *not* been normal.

There was no evidence, however, that the mother's mental illness posed a substantial risk to F. of serious physical harm or illness — in the past, in the incident precipitating the dependency, or in the future.

T. said "he was not aware of [the mother's] mental health needs until recently." Ms. B. said the mother sometimes "made remarks that were 'a little off' but were not enough to cause concern." The mother was employed as a nurse. This shows that, in general, she was functional.

F. indicated that, in the past, the mother's mental illness took the form of a religious mania — she was afraid of the devil and demons, and she asked her neighbors for holy water. None of this presented any physical risk to F. He understood that it was not normal behavior. Significantly, he was 11 years old; he was not a child of "tender years," dependent on round-the-clock care. (Cf. *In re Christopher R.* (2014) 225

14

Cal.App.4th 1210, 1216, 1219.) Admittedly, the mother was home-schooling him; however, she was doing so pursuant to an established private school program and, as far as the record shows, successfully. The family's two previous contacts with the dependency system had been due to the mother's alcohol abuse. The evidence showed that she had conquered that.

The juvenile court found that the incident that precipitated the dependency was due to the mother's Effexor withdrawal: "[S]he stopped taking her medication[,] which caused the unusual behavior that led to this case . . . ." However, she did so only once, and not just on a whim or a delusion;[4] it was giving her night terrors. She acknowledged that, when she stopped taking Effexor, she experienced "severe withdrawal[]" symptoms.

---

[4] CFS states: "[I]t is undisputed that mother stopped taking her medication without consulting her doctor." Not so. Her counsel represented that she stopped taking Effexor on the recommendation of her psychologist. "'[A]ttorneys are officers of the court, and "'when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath.'"' [Citation.]" (*People v. Mroczko* (1983) 35 Cal.3d 86, 112, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

According to the social worker's summary of his interview with the mother, she simply said she had stopped taking the medication. Later in his report, he commented that the mother, "in her professional opinion as a nurse, decided to cease medication . . . . She did not report consulting her mental health specialists . . . ." This leaves it unclear whether she actually *said* that she relied on her professional opinion as a nurse, or whether he *inferred* this from her failure to report consulting her mental health specialists.

The point is not central to our opinion. Thus, we will assume, without deciding, that the social worker's comment — although disputed — was substantial evidence.

15

At the time of the jurisdictional hearing, she was taking Effexor again. Thus, this was not evidence of a current substantial risk.

During the precipitating incident, the mother believed that T. was sexually abusing F. In response, she immediately left with F. and hid in a neighbor's back yard. Again, there is no evidence that this presented any physical risk to F. Her behavior, although based on a delusion, was protective. She "wanted to contact her pastor to see if he could help them get somewhere safe and then she wanted to contact law enforcement once they were safe." When she left the neighbor's house, she went to the home of a member of her church, and then she did, in fact, contact her pastor. The incident "scared" F.; nevertheless, after he was detained, he missed his mother.

The mother did also "destroy[]" a hotel room. However, there is no evidence of what exactly she did, except that it cost her church "a large amount for damages," and it led to her 5150 hold. She was under the delusion that she was cleaning it and rearranging the furniture. Yet again, this is insufficient evidence of any physical risk to F.

There was no evidence that the mother knew or should have known in advance that she would be placed on a 5150 hold. Therefore, she cannot be held responsible for failing to arrange for F.'s care during the hold. In any event, F. still was not placed at any physical risk. He was left with church members; Ms. B. "retrieved" him and took care of him. When the mother was released, on February 13, she did not immediately contact either F. or Ms. B. At the time, however, she did not have stable housing. And on

16

February 16, F. was detained; we have no way of knowing what would have happened if he had not been.

CFS relies on *In re Travis C.* (2017) 13 Cal.App.5th 1219 (*Travis C.*). In *Travis C.*, "Mother's condition made her hear voices, believe she was being stalked, believe law enforcement was following her, believe the children were being manipulated by the government, and believe she had implants in her brain . . . ." (*Id.* at p. 1221.) "At least once, Mother became suicidal . . . ." (*Ibid.*) "Mother sought treatment for her condition, but did not consistently follow any treatment regimen." (*Id.* at p. 1222.) She had a psychiatrist who prescribed medication for her, "[b]ut she repeatedly stopped taking her medications for various lengths of time and various reasons." (*Ibid.*)

Whenever the mother's condition was unstable, the maternal grandparents cared for the children. (*Travis C.*, *supra*, 13 Cal.App.5th at p. 1222.) "[T]he maternal grandparents confiscated Mother's keys when they believed she could not drive." (*Ibid.*) Nevertheless, "Mother continued to drive alone with the children in the car, including when she was experiencing symptoms of her illness." (*Ibid.*) The mother's psychiatrist had "concerns" about the safety of the children "[i]f Mother were to be off her medication or if the maternal grandmother were not involved . . . ." (*Ibid.*)

The appellate court held that there was sufficient evidence to support jurisdiction based on failure to protect under section 300, subdivision (b). (*Travis C.*, *supra*, 13 Cal.App.5th at pp. 1226-1227.) It noted the mother's threat to commit suicide, her failure to take her medication, and her driving with the children in the car. (*Id.* at p. 1226.) It

17

concluded: "DCFS's inability to precisely predict how Mother's illness will harm [the children] does not defeat jurisdiction. Mother's illness and her failure to consistently treat it have already put [the children] into situations where they were at a substantial risk of serious physical harm. It is not necessary for DCFS or the juvenile court to precisely predict *what* harm will come to [the children] because Mother has failed to consistently treat her illness. Rather, it is sufficient that Mother's illness and choices create a substantial risk of *some* serious physical harm or illness." (*Id*. at pp. 1226-1227.)

Evidence of a current substantial risk of serious physical harm, such as there was in *Travis C.*, is precisely what is lacking here. There, the mother *repeatedly* failed or refused to take her medication. When she was delusional, the grandparents had to care for the children. It was not safe for her to drive with the children in the car, yet she persisted in doing so. Her treating psychiatrist opined that if the children were left in her sole care when she was off her medication, there was a risk to their safety.

Here, by contrast, there was no evidence that the mother ever threatened to commit suicide or to harm any other person. There was no evidence that, when she was on her medication, anyone else ever had to step in and care for F. She had gone off her medication only once, for an understandable reason and, according to her counsel, on her psychologist's advice; however, by the time of the hearing, she had begun taking it again. There was no evidence that her delusions ever led her to do anything dangerous, not even during the psychotic break that led to the dependency. There was not even any evidence that she ever drove; the record shows her church paying for her to take Ubers.

18

Rather than *Travis C.*, we follow *In re Matthew S.* (1996) 41 Cal.App.4th 1311 (*Matthew S.*).  There, the mother lived with her son, aged 13, and her daughter, aged 16.  (*Id.* at p. 1314.)  She had a delusion that her son's penis had been "mutilated," that he had been admitted to a hospital, that she went on a trip to South America, that when she returned, she found her son in a "septic state," and that she murdered the treating physician.  (*Id.* at pp. 1314-1315.)  She took her son to a urologist, who found nothing amiss; however, he alerted the authorities.  (*Id.* at p. 1314.)

The children, when interviewed, added that the mother believed that she had been married to a famous actor, and that he had been killed by the Mafia.  (*Matthew S.*, *supra*, 41 Cal.App.4th at p. 1314.)  The children, however, had a good, loving relationship with her.  They were not afraid of her, they did not think she would become violent, and they wanted to remain with her.  They were "confused" by her delusions; however, they recognized them as such.  (*Id.* at pp. 1316, 1317.)  A psychological evaluation concluded that the mother had "a rich and complex delusional system," but "it would do more harm than good . . . remove the children from the mother."  (*Id.* at p. 1317.)

The appellate court held that there was insufficient evidence to support jurisdiction based on failure to protect under section 300, subdivision (b).  (*Matthew S.*, *supra*, 41 Cal.App.4th at p. 1314.)  It explained:  "There is no evidence that Matthew S. has suffered, or that there is substantial risk that he will suffer, serious physical harm or illness as a result of [the mother]'s supervision and protection of him. . . .  Aside from going to the urologist to make sure her son was not harmed after she had a delusion, she

19

is an excellent mother. Matthew S. consistently expressed no fear of [the mother] for any reason. Neither did his siblings. She has a well-kept home, provides meals to her children and has consistently obtained medical treatment for the children. Her children are healthy, well-groomed and attractive. She has voluntarily participated in extensive therapy for herself over the years, too. There is no evidence that she drinks or abuses substances." (*Id*. at p. 1319.)[5]

The mother here was far less disturbed than the mother in *Matthew S.* Like her, however, she had independently obtained mental health treatment. Like Matthew S., F. was old enough to understand that his mother had delusions. Her psychotic break had scared him, but he had not been physically harmed nor at risk of physical harm. When he stayed with Ms. B., he missed the mother. There was no evidence that the mother neglected his nutrition, health, or grooming in any way. The mother's claim that T. did not let her or F. eat or drink turned out to be a delusion, or at least an exaggeration; F. ultimately "reported that he was able to eat meals for breakfast, lunch, and dinner on a regular basis and never went without food in the home . . . ."[6]

---

[5]   The court went on to conclude that there *was* sufficient evidence of jurisdiction based on serious emotional damage under section 300, subdivision (c). (*Matthew S.*, *supra*, 41 Cal.App.4th at pp. 1320-1321.) One justice dissented; he believed there was no jurisdiction on either ground. (*Matthew S.*, *supra*, 41 Cal.App.4th at pp. 1321-1324 [dis. opn. of Stone, J.].)

[6]   Even assuming that T. did prevent the mother and F. from eating regularly, that would have been some evidence of failure to protect, but it would not show that the failure to protect was due to the mother's mental illness, as alleged.

The only arguable distinction from *Matthew S.* is that here, the mother used marijuana "occasionally." She had had one positive test for marijuana. However, at all relevant times, marijuana use was legal under California law. Her one positive test occurred after F. had already been removed. "[A] parent's use of marijuana '*without more*,' does not bring a minor within the jurisdiction of the dependency court. [Citation.]" (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003.) There was no evidence that her marijuana use affected F. in any way.

The juvenile court stated that the mother's marijuana use "is inconsistent with appropriate treatment for her diagnosis . . . ." There is no evidence of this, and it is neither a matter of common knowledge nor indisputable. (See Evid. Code, § 452, subds. (g), (h).) To the contrary, there is some reason to believe that marijuana can be beneficial for PTSD. (Cermak, *Veterans, PTSD, and Cannabis*, Psychology Today (Mar. 18, 2022), available at <https://www.psychologytoday.com/us/blog/healing-addiction/202203/veterans-ptsd-and-cannabis>, as of Mar. 8, 2023.) Even assuming the juvenile court was correct, however, there was no evidence that the mother knew or should have known that marijuana was medically contraindicated for her, nor that it had actually worsened her condition.

The juvenile court also found (albeit in connection with disposition) that the mother's marijuana use impeached her credibility: "I do have concerns regarding the fact that she's indicated to her treatment program that she's had two-and-a-half years of sobriety; although the information in the report regarding the living situation, as well as

21

her positive test for marijuana, would seem to indicate otherwise." Her statement to the treatment program, however, evidently refers to alcohol: "She . . . has not had a positive test, *including for alcohol*. She states she has 2 & ½ years of sobriety." (Italics added.) Elsewhere, she said she had not used alcohol "in over two years." It is reasonable that she would understand "sobriety" in terms of alcohol, as alcohol had been the cause of her 2011 and 2019 contacts with the dependency system.

CFS mounts a fiercer attack on the mother's credibility. It says: "[M]other told the social worker she had not smoked marijuana in years, but drug test results confirmed that this was a lie." The cited portions of the record, however, do not show that she told the social worker this, nor do any other portions.

In any event, our analysis does not depend on the mother's credibility. In accordance with the applicable standard of review, we resolve all disputed factual issues against her — e.g., that she did stop taking Effexor unilaterally. Even so, we conclude that CFS did not meet its burden of proving that her mental illness posed a substantial risk of serious physical harm to F.

Are we concerned about F. if he is placed back in the mother's custody? Of course. For one thing, the record does not give us confidence that CFS conducted a thorough investigation. However, CFS had the burden of proof; the requirement of a *substantial* risk of *serious physical* harm sets a high bar; and vague concern does not suffice to get over it.

"Our conclusion the sustained allegations of the petition do not support jurisdiction does not mean [CFS] cannot try again.  Indeed, it is entirely possible valid grounds exist for the state to assume jurisdiction over th[is] child[] and indeed it may be in the child[]'s best interests for this to happen.  But [CFS] failed to prove the grounds it asserted or to assert the grounds it might have proved."  (*In re Janet T.* (2001) 93 Cal.App.4th 377, 392.)

## III

## DISPOSITION

The jurisdictional order is reversed; the dispositional order is vacated as moot. (See *In re A.L.* (2017) 18 Cal.App.5th 1044, 1051.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.


We concur:

McKINSTER

J.

MILLER

J.

23